Michael R. Lozeau (State Bar No. 142893)
E-mail: michael@lozeaudrury.com
Rebecca L. Davis (State Bar No. 271662)
E-mail: rebecca@lozeaudrury.com
Douglas J. Chermak (Bar No. 233382)
Email: doug@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Armita Ariano (CA Bar No. 314434)
Email: armita@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER,<br><br><br>Plaintiff,<br><br>v.<br><br>CERTIFIED AUTO SALVAGE;<br>CARL P. & MARION B. STEVENS TRUST,<br><br>Defendants. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Complaint                               1

Orange County Coastkeeper ("Coastkeeper" or Plaintiff"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On August 31, 2022, Plaintiff issued a 60-day Notice of Violation and Intent to Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and fully incorporated by reference herein, to Certified Auto Salvage ("Certified" or "Defendant"), and the Carl P. & Marion B. Stevens Trust and its successor co-trustees Ron Stevens and Judy Wislocki (individually and collectively, "Owner and/or Operator") as the owners and/or operators of Certified's industrial facility located at 904 E. 2nd Street, Santa Ana, California 92701 ("Facility"). The Notice Letter informed Certified and the Owner and/or Operator of the violations of the Act and National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended in 2018 (effective July 1,2020) (hereinafter, the "Storm Water Permit") and the Clean Water Act at the Facility. The Notice Letter informed Certified and the Owner and/or Operator of Plaintiff's intent to file suit to enforce the Storm Water Permit and the Clean Water Act.

3.    The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental

Complaint                                      2

Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.    Sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendant and the State and Federal agencies. Plaintiff is informed and believes, and theron alleges, that neither the EPA, USDOJ, nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.    Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.    Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.    **INTRODUCTION**

7.    This Complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, Coastkeeper is informed and believes, and thereon alleges, that Defendant's discharges of pollutants from the Facility enter into the City of Santa Ana's municipal storm sewer system, which discharge into Santa Ana Delhi Channel, which then flows into Upper Newport Bay, then Lower Newport Bay, and ultimately into the Pacific Ocean (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring since at least September 9, 2017, and are ongoing and continuous.

Complaint                                    3

8.     With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas that are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III.   PARTIES

### A.     Orange County Coastkeeper.

9.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California and has at least 2,441 members. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

10.    Orange County Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further these goals, Orange County Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

11.    Members of Orange County Coastkeeper live and own homes in Orange County, and near the Santa Ana Delhi Channel, Newport Bay, and its terminus at the

Complaint                                   4

Pacific Ocean and use and enjoy the waters to which the Facility discharges storm water. Members of Orange County Coastkeeper use these waterways to participate in a variety of water sports and other activities including, but not limited to, fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and/or engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility into the Receiving Waters impairs each of these uses.

12.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such pollution, and failure to act in accordance with the Storm Water Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in the Receiving Waters, and impairs Orange County Coastkeeper members' use and enjoyment of those waters, giving Plaintiff standing on behalf of its members.

13.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiff's members caused by Defendant's activities.

14.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.     The Owner and/or Operator of the Facility.**

15.     Certified Auto Salvage ("Certified") is the current owner and/or operator of the Facility, has been the owner and/or operator of the Facility since at least 2017, and is a responsible party under the Clean Water Act.

16.     Coastkeeper is informed and believes, and thereon alleges, that Certified Auto Salvage is an active California corporation.

Complaint                                   5

17. Coastkeeper is informed and believes, and thereon alleges, that Hamidreza Afrasiabi is the registered agent for service of process for Certified located at 904 E. 2nd Street, Santa Ana, CA 92701.

18. Coastkeeper is informed and believes, and thereon alleges, that Hamiderza Afrasiabi is the Chief Executive Officer and Director of Certified Auto.

19. Coastkeeper is informed and believes, and thereon alleges, that the owner of the land upon which the Facility operates is the Carl P. & Marion B. Stevens Trust.

20. Coastkeeper is informed and believes, and thereon alleges, that Certified has a lease agreement or other contractual relationship with the Carl P. & Marion B. Stevens Trust that gives the Carl P. & Marion B. Stevens Trust knowledge and/or control of Certified's industrial activities.

21. Certified Auto Salvage and the Carl P. & Marion B. Stevens Trust are the responsible parties under the Clean Water Act, and are collectively referred to herein as "Defendant."

## IV. **LEGAL BACKGROUND**

### A. **The Clean Water Act.**

22. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

23. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

24. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

25.    The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

26.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

27.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id*.

28.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

29.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

30.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

31.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

Complaint                              7

32.    Defendants are each "persons" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

33.    A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. See 33 U.S.C. § 1365(a).

34.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $59,973 per day per violation for all violations. See 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

35.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    California's Storm Water Permit.**

36.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

37.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. See 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

38.    California is a state authorized by EPA to issue NPDES permits.

39.    In California, the State Board is charged with regulating pollutants to protect California's water resources. See Cal. Water Code § 13001.

40.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

41.    The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

42.     On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate, inter alia, Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

43.     In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. See Storm Water Permit, Finding 17.

44.     Violations of the Storm Water Permit are violations of the Clean Water Act. See Storm Water Permit, § XXI(A) (Duty to Comply).

45.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. See Storm Water Permit, Discharge Prohibition III(B).

46.     The Storm Water Permit does not provide for any mixing zones by dischargers. The Storm Water Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**C.     The Storm Water Permit's Requirement for BMPs that Achieve BAT and BCT.**

47.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Storm

Water Permit, Effluent Limitation V(A). Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

48.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

49.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the Storm Water Permit via the Numeric Action Levels ("NALs") set forth in Table 2. *See* Storm Water Permit, § XI(B) (Monitoring, Sampling and Analysis).

50.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. Storm Water Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP, Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

51.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; lead – 0.262 mg/L; copper – 0.0332 mg/L; zinc – 0.26 mg/L; nickel – 1.02 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

52.     The Storm Water Permit establishes annual NALs and instantaneous maximum NALs.  The following annual NALs have been established under the Storm Water Permit: TSS – 100 mg/L; copper – 0.0332 mg/L; zinc – 0.26 mg/L; nickel – 1.02 mg/L;  iron – 1.0 mg/L; N+N – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an

Complaint                                     10

entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The Storm Water Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

53.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility. *Id*.

**D.    The Storm Water Permit's Numeric Effluent Limitations and Water Quality-Based Corrective Actions.**

54.    Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E.

55.    An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceeds the instantaneous maximum NEL value. Storm Water Permit, Section V(C)(1).

56.    An exceedance of an NEL is a violation of the Storm Water Permit and the Clean Water Act. *Id*.

57.    The Facility is subject to the San Diego Creek and Newport Bay TMDL requirements for toxics, which include the following Total Instantaneous Maximum NELs for Upper Newport Bay and Lower Newport Bay and Bay Segments (including Santa Ana Delhi Channel): cadmium – 0.042 mg/L; copper – 0.00578 mg/L; lead – 0.221 mg/L; zinc – 0.095 mg/L. *Id*., Attachment E.

58.    Section XX(B)(1) of the Storm Water Permit requires discharges to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL in Attachment E.  They are required to perform the following actions:

(i)     Conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented;

(ii)    Assess the facility's SWPPP and its implementation to determine whether additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI); and

(iii)   Certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E); or no additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E). *Id*., § XX(B)(1).

### E.     The Storm Water Permit's Receiving Water Limitations.

59.     The Receiving Waters are ecologically sensitive areas, which provide an essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

60.    The CWA and the Storm Water Permit's Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standards ("WQS"). 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); Storm Water Permit, Receiving Water Limitation VI(A).

61.    WQS establish the water quality goals for a water body. 40 C.F.R. §131.2.

62.    WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

63.    Discharges above or below WQS cause and/or contribute to impairment of the beneficial uses of the waters that receive polluted discharges.

64.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan, called a basin plan, which contains WQS for water bodies within its geographical area.

65.    The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies in the Santa Ana Regional Board's region. The beneficial uses of the Santa Ana Delhi Channel, Upper Newport Bay, and Lower Newport Bay include, among others, water contact recreation, non-contact water recreation, commercial and sport fishing, warm freshwater habitat, rare, threatened or endangered species, biological habitats of special significance, spawning, reproduction and development, wildlife habitat, marine habitat, and estuarine habitat. See Water Quality Control Plan for the Santa Ana Region ("Basin Plan") at Table 3-1.

66.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

67. According to the 2018 303(d) List of Impaired Water Bodies, Upper Newport Bay is impaired for sedimentation, PCBs (Polychlorinated biphenyls), toxicity, indicator bacteria, and copper. Lower Newport Bay is impaired for indicator bacteria, PCBs, toxicity, and copper. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

68. Discharges of polluted storm water to the Receiving Waters pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

69. Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the beneficial uses of the Receiving Waters.

70. WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the water quality objectives in the Basin Plan, and the "Establishment of Numeric Criteria for Priority Toxic Pollutants in the State of California" ("CTR"), 40 C.F.R. § 131.38.

71. The Santa Ana Basin Plan includes a narrative WQS that establishes a toxicity standard that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." Santa Ana Basin Plan at 4-6.

72. The Santa Ana Basin Plan also includes a narrative WQS that establishes a suspected and settleable solids standard that "[i]nland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses." Santa Ana Basin Plan at 4-19.

73. The Santa Ana Basin Plan also states that "[t]he concentrations of contaminants in waters which are existing or potential sources of drinking water shall not occur at levels that are harmful to human health." Santa Ana Basin Plan at 4-20.

74.    The Santa Ana Basin Plan also states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." Santa Ana Basin Plan at 4-26.

75.    The CTR establishes numeric WQS to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008    (April    2000),    available    at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

76.    The numeric WQS established in the CTR for freshwater for lead is 0.065 mg/L (Criteria Maximum Concentration – "CMC"), for copper is 0.013 mg/L (CMC), and for zinc is 0.12 mg/L (CMC), assuming a water hardness calculation of 100 mg/L for all three parameters.

77.    The CTR numeric limits are expressed as dissolved metal concentrations.

78.    Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI(A) of the Storm Water Permit.

79.    The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* Storm Water Permit, Section VI(B).

80.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the Storm Water Permit.

**F.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

81.    Dischargers must develop and implement a Storm Water pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. *Id*., § X(B). The SWPPP must meet all of the requirements of the Storm Water

Permit. *Id.*, §§X(A)-(H); See also *id.*, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id.*, §X(G).

82.    The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *Id.*, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, § X(C).

83.    The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.*, § X.

84.    The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. *Id.*, §§ X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional

BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. *Id*., §§ X(B), XV.

85.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id.*, § X(B)(1).

**G.    The Storm Water Permit's Monitoring Requirements.**

86.    The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. *Id*., §§ X(I), XI.

87.    The Storm Water Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the Storm Water Permit. *Id*., §§ X(I), XI(A)-XI(D).

88.    The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See Id.*, § XI.

89.    An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id.*

90.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. *Id*., § XI(B).

91.    Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

92.    Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease,

discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

93.     Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See id.*, § XI(A)(3).

94.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id.*, § XI(B)(4).

95.     Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

96.     The Storm Water Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). *Id.*, § XI(B)(3).

97.     Storm water samples must be analyzed for, inter alia, TSS, pH, O&G, additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, and those required under a facility's Standard Industrial Classification ("SIC") code. *Id.*, § XI(B)(6).

98.     Table 1 of the Storm Water Permit requires dischargers with SIC code 5015 (Motor Vehicle Parts, Used) to analyze storm water samples for iron, lead, and aluminum.

99.     Section XI(B)(11) of the Storm Water Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

**H.    The Storm Water Permit's Exceedance Response Actions Requirements.**

100.    Under the Storm Water Permit, facility operators are required to perform Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL exceedances.

101.    An annual NAL exceedance occurs when the average of all analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

102.    An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. *Id.*, § XII(A).

103.    Upon receiving NOI coverage, all permittees are deemed in "Baseline status." *See id.*, § XII(B).

104.    A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *See id.,* § XII(C).

105.    Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *Id*., § XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See id.*, §§ XII(C)(1)(a)-(c).

106.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See id.*, § XII(C)(1)(c).

107.    Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status,

Complaint                                              19

revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See id.*, § XII(C)(2)(a)(i)-(ii).

108.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See id.*, § XII(C)(2)(a)(iii).

109.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.*, § XII(C)(2)(b).

110.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *Id.*, § XII(D).

111.   A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *Id.*, § XII(D).

### I.   The Storm Water Permit's Annual Reporting Requirements.

112.   Section XVI of the Storm Water Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

113.    The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the requirements of the Storm Water Permit, an explanation for, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See id.*, § XVI.

114.    Annual Reports are certified by the legally responsible person under penalty of perjury.

## V.    **FACTUAL BACKGROUND**

### A.    **The Facility's Storm Water Permit Coverage.**

115.    Plaintiff alleges that Defendant obtained Storm Water Permit coverage for the Facility since at least March 2017 by submitting a NOI to the State Board.

116.    The Facility's NOI identifies the operator of the Facility as Certified Auto Salvage with an address of 904 E. 2nd Street, Santa Ana, California 92701.

117.    The Facility's NOI lists the Facility size as 35,000 square feet.

118.    The Facility's SWPPP, which was last updated March 20, 2017, approximately 95% of the Facility, including rooftops, is impervious.

119.    Per the Facility SWPPP, the Facility's operating hours are Monday through Saturday, 8:00 am to 4:00 pm.

120.    The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 8 30I027101.

121.    SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

122.    The NOI lists the SIC code for the Facility as 5015 (Motor Vehicle Parts, Used).

123.    The Facility must obtain Storm Water Permit coverage for the entire Facility. *See id.*, § XVII(E)(1).

124.   Plaintiff is informed and believes, and thereon alleges, that the Defendant is required to sample storm water for pH, O&G, total suspended solids, aluminum, iron, lead, copper, and zinc.

**B.    Industrial Activities and Pollutant Sources at the Facility.**

125.   Plaintiff is informed and believes, and thereon alleges, that the Facility engages in the dismantling of motor vehicles for the purpose of reselling and recycling parts.

126.   Plaintiff alleges that the industrial processes that occur at the Facility include, but are not limited to, the following: motor vehicle dismantling, vehicle fluid draining, motor vehicle storage, vehicle parts storage, body work and parts storage, electrical parts storage, tire and wheel storage, vehicle fluid storage, and accumulation and storage of hazardous materials. Vehicle dismantling includes, but is not limited to, removing engines and drive train components, interior and exterior parts, and fluids from used and/or damaged vehicles.

127.   Plaintiff is informed and believes, and thereon alleges, that the vast majority of the Facility operates outdoors.

128.   Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, which is tracked to areas of exposure and then outside of the Facility.

129.   Plaintiff is informed and believes, and thereon alleges, that storm water flows over the surface of the Facility where industrial activities occur, including activities associated with dismantling, storing, recycling, and reselling motor vehicles and motor vehicle parts.

130.   Plaintiff is informed and believes, and thereon alleges, that storm water flowing over these areas collects metals and other pollutants as it flows towards the storm water discharge locations.

131.   Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

132.   Plaintiff alleges that Defendants have not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

133.   BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

134.   Plaintiff is informed and believes, and thereon alleges, Defendants' failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

135.   Plaintiff is informed and believes, and thereon alleges, that these illegal discharges of polluted storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

**C.    The Facility's Storm Water Sampling Points and Discharges to the Receiving Waters.**

136.   Plaintiff alleges that the Facility collects and discharges storm water from its 35,000 square foot industrial site through at least two discharge locations.

137.   Plaintiff alleges that the discharge locations at the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.

138.   The Facility's SWPPP indicates the Facility has two storm water sampling points, labeled DP-1 and D-2 on the Facility's SWPPP Map. DP-1, sometimes referred to as the "Southeast Corner" discharge location in Defendant's sampling reports, is located at the southeast corner of the Facility and accepts runoff from the majority of the Facility's outdoor material storage yard, vehicle dismantling, and other industrial activities. DP-2,

sometimes referred to as the "Yard Drain" discharge location in Defendant's sampling reports, is located east of DP-1.

139.    Plaintiff alleges that storm water discharges from the Facility flow into the City of Santa Ana's municipal storm sewer system, which discharges into the Santa Ana Delhi Channel, which then flows into Upper Newport Bay, then Lower Newport Bay, and ultimately into the Pacific Ocean.

140.    Plaintiff alleges that Santa Ana Delhi Channel, which then flows into Upper Newport Bay, then Lower Newport Bay, and the Pacific Ocean are waters of the United States.

**D.    Defendant's Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions.**

141.    Except as authorized by Section IV of the Storm Water Permit, permittees are prohibited from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. See Storm Water Permit, Discharge Prohibition III(B).

142.    Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

143.    Plaintiff is informed and believes, and thereon alleges, that some unauthorized non-storm water discharges appear to be intentional releases of pollutants directly into a storm drain adjacent to the Facility. This allegation is based on City of Santa Ana inspection reports obtained by Plaintiff that describe instances of unauthorized non-storm water discharges. For example, the City reported an illegal discharge of non-storm water from washing the sidewalk in front of the Facility and the Facility itself with a hose on February 18, 2022.

144.    Plaintiff is informed and believes, and thereon alleges, that the Facility conducts industrial activities without BMPs to prevent unauthorized non-storm water

discharges. Non-storm water discharges resulting from using a hose on the sidewalk and Facility are not listed among the authorized non-storm water discharges in Section IV(A) of the Storm Water Permit and thus are always prohibited under the Storm Water Permit.

**E.    Defendant's Violations of the Storm Water Permit's Receiving Water Limitations and Discharge Prohibitions.**

145.    Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by the Defendant demonstrates that discharges from the Facility contain concentrations of copper that cause or contribute to a violation of the applicable WQS in the CTR. For example, storm water samples collected by Defendant on March 10, 2020 and November 7, 2020 all contained concentrations of copper at levels which exceed the CMC of 0.013 mg/L for copper set forth in the CTR.

146.    Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by the Defendants demonstrate that discharges from the Facility contain concentrations of lead that cause or contribute to a violation of the applicable WQS in the CTR. For example, storm water samples collected by Defendant on March 10, 2020 and November 7, 2020 all contained concentrations of lead at levels that exceed the CMC of 0.065 mg/L set forth in the CTR.

147.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility that contain concentrations of copper and lead in excess of applicable WQS adversely impact human health and the environment.

148.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility that contain concentrations of copper and lead in excess of applicable WQS cause or threaten to cause pollution, contamination, or nuisance.

149.    Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI(A) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

150.    Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI(B) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

151.    Each time discharges from the Facility threaten to cause pollution or a public nuisance is a separate and distinct violation of Receiving Water Limitation VI(C) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

152.    Each time discharges from the Facility cause or threaten to cause pollution, contamination, or nuisance is a separate and distinct violation of Discharge Prohibition III(C) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

**F.    Defendant's Violations of the Storm Water Permit's Requirement for BMPs that achieve BAT and BCT.**

153.    Plaintiff is informed and believes, and thereon alleges, that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

154.    Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and incorporated into the Storm Water Permit.

155.    Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

156.    Plaintiff alleges that during the 2020-2021 Reporting Year, the Facility discharged storm water that exceeded the EPA Benchmark and annual NAL for TSS of 100 mg/L.

157.    Plaintiff alleges that during the 2020-2021 and 2019-2020 Reporting Years, the Facility discharged storm water that exceeded the EPA Benchmark and annual NAL for O&G of 15 mg/L.

158.    Plaintiff alleges that during the 2020-2021 Reporting Year, the Facility discharged storm water that exceeded the EPA Benchmark and annual NAL for lead of 0.262 mg/L.

159.    Plaintiff alleges that during the 2020-2021 and 2019-2020 Reporting Years, the Facility discharged storm water that exceeded the EPA Benchmark and annual NAL for iron of 1.0 mg/L.

160.    Plaintiff alleges that during the 2020-2021 and 2019-2020 Reporting Years, the Facility discharged storm water that exceeded the EPA Benchmark and annual NAL for aluminum of 0.75 mg/L.

161.    Plaintiff alleges that during the 2020-2021 and 2019-2020 Reporting Years, the Facility discharged storm water that exceeded the EPA Benchmark and annual NAL for copper of 0.0332 mg/L.

162.    Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and benchmark values demonstrate that the Defendant has failed and continues to fail to develop and/or implement BMPs that comply with the Storm Water Permit's BAT/BCT standards.

163.    Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the Storm Water Permit is a separate and distinct violation of the Clean Water Act.

164.    The Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least September 9, 2017.

**G.    Defendant's Violations of the Storm Water Permit's Numeric Effluent Limitations.**

165.    Plaintiff is informed and believes, and thereon alleges, that the Facility has exceeded the applicable total instantaneous maximum NELs for copper during the 2020-2021 Reporting Year in violation of Effluent Limitation V(C)(1) of the Storm Water Permit.

166.    Storm water sampled by the Owner and/or Operator on November 7, 2020 demonstrated copper levels at 0.55 mg/L at the Facility's Southeast Corner discharge location and 0.26 mg/L at the Yard Drain discharge location, both of which exceed the NEL limitation of  0.00578 mg/L for copper.

**H.    Defendant's Violations of the Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

167.    The Facility's SWPPP is publicly available via the SMARTS database and is dated March 20, 2017.

168.    Plaintiff is informed and believed, and thereon alleges that the SWPPP referenced in paragraph 167 is the current SWPPP for the Facility.

169.    Plaintiff is informed and believed, and thereon alleges that Defendant has failed and continues to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the Storm Water Permit.

170.    Plaintiff alleges that the SWPPP fails to include an Annual Evaluation in violation of Section X(A)(9) of the Storm Water Permit.

171.    Plaintiff alleges that the SWPPP fails to contain procedures to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable in violation of Section X(D)(1)(c) of the Storm Water Permit.

172.    Plaintiff alleges that the SWPPP fails to describe all NSWDs and how they have been eliminated in violation of Section X(G)(1)(e) of the Storm Water Permit.

173.    Plaintiff alleges that the SWPPP's Site map violates Section X(E) of the Storm Water Permit in that it fails to show the locations of municipal storm drain inlets that may receive the Facility's industrial storm water discharges and authorized NSWDs; incorrectly indicates the extent of areas that are impervious; fails to show where all materials are directly exposed to precipitation; and fails to show all industrial storage areas and all areas of industrial activity that may have potential pollutant sources.

174.    Plaintiff alleges that the SWPPP violates Section X(G)(2)(b) of the Storm Water Permit because the SWPPP fails to identify areas of the Facility where the minimum BMPs will not adequately reduce or prevent pollutants in the storm water discharge in compliance with Section V(A) of the Storm Water Permit.

175.   Plaintiff is informed and believes, and thereon alleges that Defendant has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants and consistent exceedances of applicable NALs, NELs, and water quality standards.

176.   Plaintiff alleges that the SWPPP violates Section X(H) of the Storm Water Permit because the SWPPP fails to implement required advanced BMPs and fails to identify and justify each minimum BMP or applicable BMP not being implemented at the Facility.

177.   Plaintiff alleges that the SWPPP fails to implement advanced BMPs as required by Section X(H) of the Storm Water Permit.

178.   Plaintiff alleges that the SWPPP violates Section (X)(I)(4) and (X)(I)(5) of the Storm Water Permit because the SWPPP's Monitoring Implementation Plan ("MIP") does not contain procedures for field instrument calibration instructions, including calibration intervals specified by the manufacturer and does not contain an example Chain of Custody form used when handling and shipping water quality samples to the lab.

179.   Plaintiff alleges that Defendant failed to amend the SWPPP with applicable TMDL NEL exceedance information, and also failed to certify and submit the revised SWPPP to SMARTS, in violation of Section VII(C)(3) of the Storm Water Permit. Defendant has failed to make these revisions since at least November 7, 2020.

180.   Plaintiff is informed and believes, and thereon alleges, that Defendant is in violation of Storm Water Permit Sections X(B) and XII(C) by failing to update the Facility's SWPPP in response to the ERA Reports submitted to SMARTS since its last revision of the SWPPP in 2017. For example, the Facility's Level 1 ERA Report submitted on January 1, 2021, set forth specific BMP and SWPPP revisions that necessary to prevent future NAL exceedances and indicated that revisions would be documented in the SWPPP's amendment log. However, the SWPPP has not been updated to reflect the updated BMPs.

Complaint                                  29

181.   Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

182.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least September 9, 2017.

**H.    Defendant's Violations of the Storm Water Permit's Monitoring Requirements.**

183.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

184.   Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates that there were numerous QSEs at the Facility during the past several Reporting Years that Defendant failed to monitor. *See* Notice Letter, Attachment A.

185.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to collect storm water discharge samples from all QSEs as required by Section XI(B)(3) of the Storm Water Permit as follows:

- Failure to collect and analyze two samples from all outfalls during the first half of the 2017-2018 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2017-2018 reporting year.

- Failure to collect and analyze two samples from all outfalls during the first half of the 2018-2019 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2018-2019 reporting year.

- Failure to collect and analyze two samples from all outfalls during the first half of the 2019-2020 reporting year.

- Failure to collect and analyze a second sample from all outfalls during the second half of the 2019-2020 reporting year.

- Failure to collect and analyze a second sample from all outfalls during the first half of the 2020-2021 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2020-2021 reporting year.

- Failure to collect and analyze two samples from all outfalls during the first half of the 2021-2022 reporting year.

- Failure to collect and analyze two samples from all outfalls during the second half of the 2021-2022 reporting year.

186.   Plaintiff is informed and believes, and thereon alleges, that Defendant has never monitored the storm water outfall located at the Facility entrance on E 2nd Street in violation of Section XI(B) of the Storm Water Permit, which requires dischargers to collect and analyze discharges from all outfalls at a facility.

187.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to analyze storm water discharges from the Facility for zinc in violation of Storm Water Permit Section XI(B)(6) since at least September 9, 2017.

188.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the Storm Water Permit's MIP and monitoring requirements since at least September 9, 2017.

189.   Plaintiff is informed and believes, and thereon alleges, that the Defendant is in violation of the Storm Water Permit and the Clean Water Act because it has failed and continues to fail to adequately develop, implement, and/or revise its MIP in violation of the Storm Water Permit's MIP requirements.

Complaint                                   31

190.   Every day that Defendant operates with an inadequately developed, revised, and/or implemented MIP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

**I.    Defendant's Failure to Conduct Required Visual Observations.**

191.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated Section XI(A) of the Storm Water Permit by failing to conduct and/or keep and maintain records of monthly dry weather visual observations.

192.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated Section XI(A) of the Storm Water Permit by failing to conduct and/or keep and maintain records of visual observations of discharges from each discharge location. monthly dry weather visual observations.

**J.    Defendant's Failure to Submit Sampling Results that Comply with the Storm Water Permit's Reporting Requirements.**

193.   Plaintiff is informed and believes, and thereon alleges, that Defendant is in violation of Storm Water Permit Section XVI for failure to submit an Annual Report for the 2021-2022 Reporting Year.

**K.    Defendant's Failure to Perform Water Quality-Based Corrective Action.**

194.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to comply with water quality-based corrective actions in violation of Section XX(B)(1) of the Storm Water Permit, including failing to conduct the required Facility evaluations, failing to properly assess the Facility's SWPPP, and submitting the required documentation to SMARTS.

**L.    Defendant's Violations of the Storm Water Permit's Exceedance Response Action Requirements.**

195.   Plaintiff is informed and believes, and thereon alleges, that the Facility entered Level 1 status for copper on July 1, 2020.

196.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated Section XII(C)(2) of the Storm Water Permit by failing to submit a Level 1 ERA Report for copper to SMARTs by January 1, 2021.

197.   Plaintiff is informed and believes, and thereon alleges, that the Facility entered Level 2 status for O&G, iron, aluminum, and copper on July 1, 2021.

198.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated Section XII(D)(1) of the Storm Water Permit by failing to submit a Level 2 ERA Action Plan to SMARTs by January 1, 2022 for copper and O&G.

199.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Level 2 Action Plan for aluminum, iron, lead, and TSS dated February 28, 2022 violated Section XII(D)(1)(e) of the Storm Water Permit by failing to include a schedule and detailed description of the tasks required to complete its Industrial Activity BMPs Demonstration in violation of Section XII(D)(1)(e) of the Storm Water Permit.

200.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to take Exceedance Response Actions as required by Storm Water Permit Section XII.

201.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least January 1, 2021.

202.   Plaintiff is informed and believes, and thereon alleges, that every day the Facility operates without timely submitting and implementing all required ERA documentation is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

//

//

//

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violations of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Requirement for BMPs that Achieve BAT and BCT.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

203.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

204.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of Effluent Limitation V(A) of the Storm Water Permit and the Clean Water Act, 33 U.S.C. § 1311(b). Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Effluent Limitation V(A); 33 U.S.C. § 1311(b).

205.    Each day since September 9, 2017 that Defendant has failed to develop and implement BAT and BCT in violation of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

206.    Defendant has been in violation of the BAT/BCT requirements every day since September 9, 2017. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water**
**in Violation of the Storm Water Permit's Receiving Water Limitations and Discharge Prohibitions Numeric Effluent Limitations**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

207.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

208.    Defendant has discharged storm water from the Facility, as set forth above, in violation of Effluent Limitation V(C) set forth in the Storm Water Permit.

209.    Each day that storm water discharged from each discrete monitoring point at the Facility exceeded the NEL for copper for the second time during a Reporting Year is a separate and distinct violation of Effluent Limitation V(C) of the Storm Water Permit.

210.    Defendant's violations will continue each day it discharges levels of copper in violation of the effluent limitations of the Storm Water Permit and the Clean Water Act.

211.    Each and every violation of Effluent Limitation V(C) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of Storm Water Permit's Receiving Water Limitations and Discharge Prohibitions.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

212.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

213.    Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards have and continue to be discharged each time storm water discharges from the Facility.

214.    Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that adversely affect human health and the environment have and continue to be discharged each time storm water discharges from the Facility.

215.    Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or threaten to cause contamination, pollution, and nuisance have and continue to be discharged each time storm water discharges from the Facility.

216.   Plaintiff is informed and believes, and thereupon alleges, that since at least September 9, 2017, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards for TSS, Oil & Grease, lead, iron, aluminum, and copper in violation of Receiving Water Limitations VI(A), VI(B), and VI(C), and Discharge Prohibitions III(C) and III(D) of the Storm Water Permit.

217.   Plaintiff is informed and believes, and thereupon alleges, that unauthorized non-stormwater discharges have been occurring at the Facility as a result of inadequate BMPs to prevent non-storm water discharges and as a result of intentional actions such as washing the sidewalk and Facility with a hose.

218.   Every day since at least September 9, 2017 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

219.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

220.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continues to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

221.   Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

222.    Defendant has failed to include zinc in its SWPPP's Assessment of Potential Pollutant Sources in violation of Storm Water Permit Section X.G.2.a.

223.   Each day since September 9, 2017, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and

Complaint                                    36

distinct violation of the Storm Water Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

224.   Defendant has been in violation of the Storm Water Permit's SWPPP requirements every day since September 9, 2017. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan and Perform Required Monitoring in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

225.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

226.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continues to fail to develop, implement, and/or revise an adequate MIP and monitoring program for the Facility, in violation of the Storm Water Permit.

227.   Defendant's ongoing failure to develop, implement, and/or revise an adequate MIP and monitoring program is evidenced by, *inter alia*, Defendant's failure to collect and analyze samples from all storm water discharge locations at the Facility, Defendant's failure to collect and analyze samples from all QSEs, and Defendant's failure to record and maintain records of visual observations of discharges.

228.   Defendant has been in violation of the Storm Water Permit monitoring requirements at the Facility every day from September 9, 2017, to the present.

229.   Defendant will continue to be in violation of Sections X(I) and XI of the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

230.   Each day since at least September 9, 2017, that Defendant has failed to develop, implement and/or revise an adequate MIP and monitoring program for the

Facility in violation of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Clean Water Act.

## SIXTH CAUSE OF ACTION
### Defendant's Failure to Perform Water Quality-Based Corrective Actions as Required by the Storm Water Permit.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

231.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

232.    Defendant is required to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL.

233.    Defendant has failed to conduct the required Facility evaluations, failed to properly assess the Facility's SWPPP, and failed to submit the required documentation to SMARTS.

234.    Every day since September 9, 2017, that Defendant has failed to complete the required water quality-based corrective actions in a violation of Section XX(B)(1) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

235.    Defendant has been in violation of the Storm Water Permit's water quality-based corrective action requirements every day since September 9, 2017. Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

## SEVENTH CAUSE OF ACTION
### Defendant's Failure to Comply with Storm Water Permit's Requirement for Exceedance Response Actions.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

236.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

Complaint                                      38

237.   Defendant has failed to submit a Level 1 ERA Report for copper that complies with Section XII(C)(2) of the Storm Water Permit.

238.   Defendant has failed to submit a Level 2 ERA Action Plan for copper and O&G.

239.   Defendant has failed to submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report for aluminum, iron, lead, and TSS that complies with the requirements of Section XII(D)(2)(a) of the Storm Permit.

240.   Each day since at least January 1, 2021, that Defendant has failed to prepare and submit a Level 1 ERA Report for copper for the Facility in violation of the Storm Water Permit is a separate and distinct violation of the Storm Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

241.   Each day since at least January 1, 2022, that Defendant has failed to prepare and submit  Industrial Activity BMPs Demonstration Level 2 ERA Technical Report for the Facility in violation of the Storm Water Permit is a separate and distinct violation of the Storm Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

**EIGHTH CAUSE OF ACTION**
**Defendant's Failure to Submit Annual Reports in Compliance**
**with the Storm Water Permit's Reporting Requirements.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

242.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

243.   Defendant failed to upload an Annual Report to SMARTS for the 2021-2022 Reporting Year by in violation of Storm Water Permit Section XVI.

244.   Every day the Facility operates without submitting an Annual Report for the 2021-2022 Reporting Year is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

## VII.   **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays judgment against Defendant as set forth hereafter and respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to prepare a SWPPP for the Facility consistent with the requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

i.  Order Defendant to prepare an adequate Level 1 ERA Technical Report for copper;

j.  Order Defendant to prepare an adequate Level 2 ERA Action Plan for O&G, iron, aluminum, and copper;

k.  Order Defendant to pay civil penalties of up to $59,973 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

l.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

m.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

n.  Award any such other and further relief as this Court may deem appropriate.

Dated: November 8, 2022                LOZEAU DRURY LLP

/s/ *Rebecca L. Davis*
Michael R. Lozeau
Douglas J. Chermak
Rebecca L. Davis
Attorneys for Plaintiff
Orange County Coastkeeper

Complaint                                41